HEARD APRIL TERM, 1876.

## BRICKMAN *vs.* SOUTH CAROLINA RAILROAD COMPANY.

Where an engineer in the employment of a railroad company is killed by accident to the train, caused by the gross negligence of the company in the construction of its road, the company is liable to the representatives of the engineer for such accident.

The Supreme Court has no power to grant a new trial upon the ground that the verdict was against the evidence or that the damages are excessive,—that Court having no power to weigh the evidence and draw from it conclusions of fact.

Where a motion for a new trial, made upon the ground that the verdict was without evidence to sustain it, is denied by the Circuit Judge,—not upon the ground that he had no authority to set the verdict aside, but because, in his opinion. substantial justice had been done in the case,—the Supreme Court has no power to grant the motion for a new trial.

Judgment will not be arrested because of defects in the complaint which could have been cured by amendment before or after judgment.

BEFORE REED, J., AT CHARLESTON, NOVEMBER, 1875.

This was an action by Mary A. Brickman, widow and administratrix of William H. Brickman, deceased, suing for the benefit of herself and her four children against the South Carolina Railroad Company to recover damages to the amount of $20,000 for an accident on said road which occurred about fifty miles from Charleston on the morning of September 20th, 1873, and resulted in the instant death of the plaintiff's intestate.

The complaint, after alleging that the defendant was a corporation and the owner of the road on which the accident occurred; that Brickman was an engineer in the employment of the defendant, at a salary of $120 per month, and that he came to his death on the 20th of September, 1873, by the gross negligence of the defendant, proceeded further to allege that about 3 o'clock on the morning of September 20, 1873, as the express train of the defendant was proceeding from Charleston to Augusta,

in charge of Brickman as engineer, the engine, with four box cars attached, was precipitated down a broken culvert, through which the waters were rushing to a depth of nearly fifteen feet, thereby causing the instant death of Brickman; that the road and track of the defendant at the point of accident, about fifty miles from Charleston, were defective and unsound and unfit to be used for that purpose, which the defendant might and would have known by due care, but, not regarding their duty, they negligently suffered it to be used, and that caused the death of Brickman; that at the point of accident the road of defendant rested upon an embankment of sand, which was entirely unfit and inadequate to resist the pressure of water rushing against it, and, proving defective, unsound and unfit for the purpose, was washed away in a very short time, leaving nothing to support the track of the road, and thereby causing the death of the said Brickman; that, by the gross negligence of defendant, the train of cars in charge of Brickman on the night on which the accident occurred was three hours behind its schedule time, and, by reason thereof, together with the unsound condition of the road, as before alleged, and the gross negligence of the defendant, was thrown from the road, thereby causing the death, as before alleged, of the plaintiff's intestate.

The defendant answered, admitting that it is a body corporate, owning and operating the road where the accident occurred, and that the plaintiff's intestate was at that time in the employ of the defendant as its engineer on the train to which the accident happened which caused his death, and denying all the charges of negligence against the defendant, and, for a further defense, averring that the track and road at the point of accident were in all respects sound and serviceable and fit for the purposes for which they were used; that they had been constantly and carefully supervised by competent and attentive workmen in the employ of the defendant, and that the accident was caused not by any defect in the road or train or by any negligence of the defendant, but by reason of a violent gale, accompanied by an unprecedented heavy fall of rain, which swelled the creeks and swamps in the vicinity to a height previously unknown and accumulated vast bodies of water against the road and track and undermined and destroyed them; and defendant further averred that it used due care and diligence in the construction and operation of its road and in the employment of skillful and competent persons to supervise and operate the same,

and has faithfully endeavored, to the best of its ability and judgment, to guard against and prevent accidents, and has not been negligent or careless in regard to any of the matters charged against it in the complaint.

At the hearing testimony was given on behalf of the plaintiff tending to sustain the allegations of the complaint and on behalf of defendant tending to sustain the defense set up in the answer.

The plaintiff asked the Court to instruct the jury as follows:

1. That it is a duty which a railroad company owes to its employees to furnish a proper and safe road-bed, culverts and crossings of dangerous places and trestles, as well as to select proper machinery, implements and boilers used in the operation of their road; and in procuring and constructing them to see that every safeguard known to science and the construction and testing of these instrumentalities have been employed before exposing the lives and safety of those in their service, whom they are bound by their duty and obligation to preserve from all risks other than the ordinary risk of the employment; and if the jury believes that these precautions have not been taken, their omission to do so renders the company culpable, and they should find for the plaintiff.

2. That this responsibility cannot be avoided by delegating the power to others; and the understanding is direct with their servants that they will furnish suitable and safe structures; and they cannot shift the blame upon those employed to furnish the said structure, and thus excuse themselves from an injury resulting from an unsafe and defective structure; and if the jury believe that the crossing, when plaintiff met his death, did not come up to these requirements, the plaintiff is entitled to their verdict.

3. If the plaintiff's death has resulted from the acts or property of the defendant, the burden of proof is on the defendant to exculpate itself by showing that the catastrophe was not traceable to any act or omission of its own.

4. That plaintiff could not be held responsible for the fault of a servant engaged in a different and independent part or business of the road; and if fault there was in the structure, through the defect of which he came to his death, no matter by whom done, he is bound to recover.

5. That the risk of losing his life through a broken embankment or unsafe culvert was not one of the risks incident to plaintiff's em-

ployment, and he could not contribute to the negligence of the conductor or constructor of the crossing, to whom he stood as in the relation to his master, the road; and if, from the constructor's fault, the catastrophe occurred, he can justly claim damages at your hands.

6. The elements of the contract between the company and the deceased were these: On the part of the company, so far as they were to construct, equip and move the road, that they would carry him safely; and on the part of the deceased, that he would perform certain duties. With respect to the last, he was their servant; with regard to the first, he was their passenger, and as their passenger he was killed.

7. If the jury should believe that the sudden and violent precipitation of the train down this gully was the proximate cause of his death, they should render him a verdict for damages.

And the defendant asked for the following instructions:

1. That if the jury believe that the disaster was occasioned by the sudden flood, that ends the case, and defendant cannot be liable.

2. That if the railroad company constructed their road with due skill and care, and employed competent and reliable persons to supervise the track and road-bed, then they have performed all their duty to plaintiff, as an employee, and cannot be responsible for any damage to him.

3. That in order to charge the defendant, it must be shown that the track was defective, and that the defect was known to the President and Directors of the road.

4. The defendant is responsible only for negligence, and, as between employer and employee, negligence cannot exist if the employer does his best to supply competent persons.

5. That even if there were defects in the construction of the culvert, the defendant is not liable to employees for injuries arising from these defects if it employed skillful and experienced men to construct the road and locate the culvert.

6. That employee takes the risk of his employment.

His Honor the presiding Judge instructed the jury as follows:

I regret exceedingly that you have been detained so long, but we must, nevertheless, dispose of this case quietly, calmly and justly. I regret, also, with counsel, that we had not a longer time to devote

Columbia, April, 1876.

to its development. We had done a good day's work before we commenced it, and I would not have gone into it without being assured that the testimony in the former case should be read in this and the arguments considerably shortened.

This case is a very different one from the last; in that, it was alleged that the young man who lost his life was where he ought not to have been, and that his death was caused by his own imprudence. In this, Mr. Brickman was in his proper place; he was the engineer upon the train that was precipitated into Polk Swamp, and was engaged in the proper discharge of his duty when he came to his death. This is admitted, and his wife, as administratrix, brings this action to recover damages for the loss of her husband. The case is, therefore, a legitimate one, and it is properly before the Court. She is a widow with four children, and her condition must necessarily enlist the sympathy of all kind-hearted people. But we are not to decide cases by our sympathies, but by the law and the testimony. As to the law, it is my duty to give it to you, and yours to take it as given. If I commit error, there is a higher tribunal that will correct me; but you are the exclusive judges of the testimony, and it is your duty to apply it to the law and find your verdict according to your judgment. If Mr. Brickman, the deceased engineer, had been a passenger on the train, this case would stand very differently before you from what it does now. As you heard me state this evening, a railroad company is the insurer of passengers and goods; and if the life of a passenger be lost whilst they are transporting him, nothing can excuse them from legal responsibility but the act of God or the public enemy. The deceased was, however, an employee of the road, and not a passenger; and he did not, therefore, occupy, in law, the same relation to the defendants that a passenger would. The man who goes into the employment of a railroad company does not take absolutely all the risks that might exist, but he does take the ordinary risks incident to his position, and the company are liable to him only for gross negligence. If they have exercised ordinary care and diligence in the erection of their works, such as a prudent man would take in the management of his own affairs, and the life of an employee be accidentally lost, they are not legally responsible to his representatives. There must be, as to the employee, evidence of negligence, and of gross negligence, to fix their responsibility, differing, materially, from the case of a passenger. Then, the questions for

you are: Was there negligence on the part of the defendant, and was the death of plaintiff's intestate caused by such negligence? You heard me state this evening, and I repeat it, that if there were any defects in their works or machinery that were patent, that could be seen or detected by ordinary vigilance, and the death of the deceased was caused by such defect, they would be liable, even to an employee, for all the consequences. But if they have exercised ordinary care and diligence to guard against accidents, they are not liable to an employee for latent defects; that is to say, for defects not visible to the eye upon inspection, and not to be discovered by ordinary care and prudence. That is the distinction, and it may be illustrated in this way: If an employee were required to ascend from the platform to the top of a car on a ladder that appeared to be sound, there being no defect visible to the eye, or that could be discovered by ordinary vigilance, and it turned out that the timbers were rotten internally, from which the party was thrown down and killed, the company would not be liable, because they could not have foreseen or prevented the accident. But if the defect in the ladder could have been detected by any ordinary care, and the death could be traced to a want of such care, then the company would be legally liable for the consequences.

What are the facts in this case? In the early history of defendant's road, a trestle fifty-five or sixty feet in length was built across Polk Swamp, which remained there until two or three years ago, when the Vice President, Mr. Tyler, concluded to substitute it by a brick culvert. A number of other trestles on the line of the road were filled up and culverts substituted about the same time, which, it is proven, was good engineering and good economy.

The Superintendent, before the change, employed Mr. DeCaradeux, a civil engineer by education and experience, to examine and report upon its propriety. He states that he examined the ground, and consulted with the Superintendent, Mr. Buckhalter, Mr. Thames, Mr. Fickling and a number of other persons long familiar with the locality, and made up his mind that a culvert twelve feet wide and eight or nine feet high would be amply sufficient to carry off the water; and it was constructed accordingly, and the trestle filled up. It is in testimony that the current of the stream came directly towards the culvert, and to within thirty or forty feet of its entrance, and that a rise of six inches in the stream would send the water through the culvert, where it was carried off by a canal.

The Superintendent and other men of science who examined and were engaged on the work have testified that they were of opinion the culvert was entirely sufficient to carry off any water that would collect at the locality, and that it was good engineering to construct it and fill up the trestle. Were they mistaken? Are you so satisfied from the testimony? And, if mistaken, does that make the company responsible? Is there such negligence proven on the part of the company in having permitted that work to be done by its engineers, and in running their trains over it, as to make them justly liable to an employee? or had such skill and caution been exercised as to throw on him the risk of his position? Could any of you, gentlemen, have told that there was danger there? Would you not have relied on the opinions of civil engineers and of the other persons of practical experience? or what would you have relied upon? If the company were guilty of having unskillfully and negligently constructed their road, and plaintiff's intestate came to his death thereby, then they are legally liable for the consequences. But if they exercised ordinary skill, care and diligence, they are not responsible. Gentlemen, how did this accident happen? Was there anything unusual occurred on that day that caused it? It is in testimony that there had been an extraordinary fall of rain during the evening of the 19th of September, and that there was such an accumulation of water in Polk Swamp as to overwhelm and carry off the trestle and embankment, whereby the train was precipitated in the chasm and the engineer killed. Was this one of the ordinary heavy rainfalls that occasionally occur in the country, or was it of such an extraordinary character as to be properly characterized as the act of God, which human foresight cannot guard against? If it be the act of God, then there is no human responsibility.

Gentlemen, weigh the testimony carefully and impartially, and let your verdict reflect an honest judgment. If you are satisfied that the death of plaintiff's intestate is attributable to the gross negligence of the defendant company, you will find for the plaintiff. In making up your verdict, if you should so find, you will look to all the circumstances, and give some reasonable sum by way of damage, and not permit yourselves, as juries sometimes do, to seek the ruin of a corporation through sympathy for an individual. Counsel always ask in their cases much heavier damages than they expect to get. If, however, the plaintiff is, in your judg-

ment, entitled to recover anything, she should have reasonable compensation.

But, gentlemen, upon looking into the testimony as given upon the stand, and applying it to the rules of law, whatever may be your sympathies for the plaintiff and her. children, if the case has not been made out to your satisfaction, it is your duty to find for the defendant.

The jury found for the plaintiff $10,000,, and the defendant gave notice of a motion for a new trial upon the following grounds:

1. That the verdict was against the well-settled law of the case and the charge of the Court.

2. That the verdict was wholly unsustained by the evidence and was against the evidence in the case.

3. That the damages were excessive.

4. That the verdict of the jury was partial and capricious in the conclusion they reached and the damages they assessed.

Defendant also gave notice of a motion in arrest of judgment on the following grounds:

1. That the complaint in the said action does not aver that the said defendant had notice of the defects complained of as causing the injury.

2. That the complaint in the above action does not contain any premises or allegations from which the duty of the defendant, as therein alleged, can be inferred.

3. That the complaint does not set out any contract in which the obligation or duty of the master to safely and securely carry the servant is expressed, or from which it can be inferred.

These motions having been argued, His Honor Judge Reed, on the 4th of December, 1875, "ordered that the execution be stayed until the decision of the Appeal Court;" and on the 10th day of January, 1876, filed the following opinion and order:

I have been strongly inclined to grant a new trial in this case, as the verdict of the jury is very far from commending itself to my approval. But, after hearing the argument, my opinion has been modified, not as to the merits but as to the propriety of my applying the remedy asked for.

The law of the case is very clear to my mind, and in my charge to the jury I discriminated between the liability which the company assumed to its passengers and that which it assumed to its employees.

As to the latter, I charged that the defendant corporation could not be made liable unless it was found that they were guilty of gross negligence, and I cannot but think that the jury, in coming to their conclusion, have either misunderstood the law or misapplied it to the facts as elicited from the stand.

Whatever doubts may exist, as a question of engineering, as to whether the open trestle or the embankment and culvert made the safer road-bed at Polk Swamp, the testimony was uncontradicted that the company employed skillful persons to examine the locality and determine what was proper to be done before any change was made; and when it was decided to substitute the trestle by an embankment, the work was superintended and executed by persons of skill and experience. I do not discover the evidence, therefore, upon which the jury found gross negligence, if negligence of any degree. But there was testimony sufficient to go to the jury, and upon it they have found the verdict before us, and I am not prepared to say it is without evidence to support it.

The question as to whether the accident which caused the death of plaintiff's intestate was the result of negligence at all, or was caused by the act of God from an unusual fall of rain creating a sudden rise of the waters of Polk Swamp, which swept away the embankment and left the chasm into which the train was suddenly plunged, was also submitted to the jury with very full instructions. They were told that if the accident resulted from the act of God, that was the end of the matter; that in such a case there could be no liability even in the case of a passenger, and certainly none as to an employee, where the rule is much less stringent. This question was also determined against the defendant by the jury, and I cannot say their finding in this particular is without evidence to support it.

With regard to the damages found being excessive, I entertain very decided convictions, and on this ground alone I would unhesitatingly order a new trial if I did not regard myself restrained by the authorities pressed upon me from our own Courts. In the case of *Zempt* vs. *The Wilmington and Manchester Railroad*, a passenger who lost an arm, as I remember it, by imprudently standing on the

platform of the car, a verdict of $10,000 damages was sustained; and in the more recent case of Collins, *an employee* of the city of Charleston, as steepleman at St. Michael's Church, who lost his life by a fall, a verdict for $7,000 was set aside and one for $10,000 afterwards sustained in the same case. These recoveries are to my mind excessive, such as I could have neither given or sustained if it had been my province to pass upon them.

The Act of the New York Legislature, to which my attention has been called, fixing $5,000 as the maximum of damages that can be given in actions of this nature, is eminently wise and proper, and I would gladly follow it if it were the law here. For, according to my observation, the tendency of juries in all this class of cases is to let their sympathies run away with their judgments and give damages wholly disproportioned to the justice and merits of the case. In the absence of legislation on the subject, I think the law should be more definitely settled by adjudication in this State, that railroad companies and other public corporations may be afforded some reasonable protection, particularly against their employees, without which their proper functions must be performed with great difficulty.

The motion for new trial and in arrest of judgment are dismissed.

The defendant appealed from the order refusing the motion for new trial and in arrest of judgment on the following grounds:

1. That under the law applicable to the case the defendant was not liable for the injury sustained by the plaintiff's intestate, and that the verdict of the jury making the defendant liable was against the law, and the refusal of the Judge to set aside the verdict and grant a new trial was error of law.

2. That the verdict of the jury was without evidence to sustain it, and manifestly against the evidence in the case, and that the verdict of the jury is clearly against the evidence in the case; and the refusal of the Judge to grant a new trial is error of law.

3. That the verdict was against the law and the evidence, and should have been set aside as subversive of the law, and establishing a liability which the law does not create, and that the Circuit Judge erred in not setting aside the verdict and granting a new trial or order for judgment *non obstante veredicto.*

4. That the Circuit Judge erred in not sustaining the motion in arrest of judgment on the grounds submitted in the said motion.

5. That the damages were excessive, and were so regarded by the Circuit Judge; and, being so regarded, it was within the jurisdiction of the Circuit Judge to have set aside the verdict and granted new trial, and it is error of law not to have so ordered.

6. That on the pleadings and evidence in the case the defendant is entitled to judgment in its favor, either by way of nonsuit or by leave to enter judgment *non obstante veredicto*.

*Conner*, for appellant:

This is an action to recover damages for the death of the plaintiff's intestate, an engineer in the employ of the defendant.

The case is briefly this:

The South Carolina Railroad Company constructed a line of railroad from Charleston to Branchville. At or about the fifty-one mile post the track crossed a flat swamp known as Polk Swamp. Prior to 1872 the crossing had been on a trestle. In 1872 Mr. Tyler, the Vice-President and General Superintendent of the road, pursuing the system of establishing a solid and permanent roadway, filled in the trestles wherever practicable. Polk Swamp was filled in. The trestle was not removed; it still remained; but the spaces were filled with earth, so that at that point there was the original trestle and an embankment in addition. A culvert was made under the track to vent the water from the swamp. This work was commenced in the latter part of 1872 and finished early in 1873.

On the afternoon and night of the 19th of September there was a very heavy storm and fall of rain, extending from Charleston to Augusta. At Polk Swamp there was a fall of water greater than had ever been known in so short a time.

The accumulation of water carried away the embankment and part of the old track, and the train on which Brickman was fell into the chasm early on the morning of the 20th of September.

Several of the trains had passed over the road at that point that night safely. The last passed over it at a little after 1 o'clock the morning of the 20th of September and met the train on which Brickman was at the forty-one mile post. Tharin, the engineer of the down train, told Brickman that "he would find one or two bad places at Reeves'; he could go slowly and at the middle of the creek he would find water; with those exceptions he could go as

fast as he pleased." Brickman went on, and some time after, 3 A. M., his engine fell into the chasm at Polk Swamp and he was killed.

1. If the death of Brickman, the engineer, was occasioned by an extraordinary casualty, such as the flood, then, clearly, defendant is not liable.

"The company have shown the inevitable accident or act of God. If the effect of this arose from the imperfect structure of the bridge, embankment or trestle, the plaintiff was bound to show it."—*Lefford* vs. *Railroad Company*, 7 Rich., 410; *Railroad Company* vs. *Reeves*, 10 Wallace, 189.

These were cases of common carriers, where, of course, the responsibility is more stringent than obtains between master and servant.

*Nichols* vs. *Marsland* (L. R., 10 Exchequer, 255,) is in point. Defendant had constructed pools. There was "a rainfall greater and more violent than any within the memory of the witnesses." Defendant's banks broke and the water injured plaintiff. The Court said, no doubt not the act of God or a *vis major*, in the sense that it was *physically* impossible to resist it, but in the sense that it was *practically* impossible to do so. Had the banks been twice as strong, or, if that would not do, ten times, and ten times as high, and the weirs ten times as wide, the mischief might not have happened. But those are not practical conditions; they are such that to enforce them would prevent the reasonable use of property in the way most beneficial to the community. And the verdict for plaintiff was set aside and rule made absolute to enter verdict for defendant.

2. If the death was caused by an ordinary casualty, then the question arises: was there negligence on the part of the defendant?

The gist of the action is the negligence of the defendant, and unless that is proved there is no right of action.

But to make out negligence for which defendant is responsible to plaintiff, there must have been some defect in the road or its appointments which reasonable care could have obviated, or there must have been the want of reasonable care by the defendant in the selection of the agents and servants engaged in the management and operation of the road.

And the injury must have resulted from one or the other of these two causes.

If the defect in the road was latent, then the law is clear that defendant is not responsible.

If the defect was patent, then it was known to Brickman as well as the defendant; and if, knowing the defect, he continued in the service of the company, he voluntarily assumed the risk of the employment and no action lies.

An examination of the leading cases on this branch of the law will show the correctness of these positions, and I will class the cases under two heads :

1. The duty of the employer.

2. The responsibility of the employee.

1. The duty of the employer :

" Where a master uses due diligence in the selection of competent and trusty servants, and furnishes them with suitable means to perform the service in which he employs them, he is not answerable to one of them for an injury received by him in consequence of the carelessness of another while both are engaged in the same service."—*Farwell* vs. *Boston Railroad Company*, 4 Metc., 49 ; Redfield Supplement, p. 384.

"The master takes upon himself no higher duty than that of using reasonable care in the selection of workmen."—*Tarrant* vs. *Webb*, 18 Common Bench, 803, (88 E. C. L.)

" The master does not warrant the competency of those whom he employs." —Jervis, C. J., *ibid.*

"The master may be responsible where he is personally guilty of negligence, but certainly not where he does his best to get competent persons."—Jervis, C. J., *ibid*, 804.

The general rule is clearly and strongly laid down to the same effect in Pierce on American Railroad Law, pp. 295, 296. So, too, with regard to defects in the road and its appointments. "The company does not warrant their absolute sufficiency, and is not responsible for injuries arising from latent defects or such patent defects as the servant was himself cognizant of and had not reported to its officers. While he remains in its service, informed of such defects, he is presumed to take upon himself the risks incident thereto."—Pierce's Railroad Law, p. 294.

2. The responsibility of the employee :

" The general rule, resulting from considerations as well of justice as of policy, is that he who engages in the service of another for

the performance of specified duties and services for compensation takes upon himself the natural and ordinary risks and perils incident to the performance of such service, and, in legal presumption, the compensation is adjusted accordingly."—*Farwell* vs. *Boston Railroad Company*, 4 Metc., 49.

And Chief Justice Shaw, placing the rule on considerations of justice as well as of public policy, adds : " Where several persons are employed in the conduct of one common enterprise or undertaking, and the safety of each depends much on the care and skill with which each shall perform his appropriate duty, each is an observer of the conduct of the others, can give notice of any misconduct, incapacity or neglect of duty, and *leave the service* if the common employer will not take such precautions and employ such agents as the safety of the whole may require." * * * " It was a voluntary undertaking on his part, (the employee's,) with a full knowledge of the risks incident to the employment; and the loss was sustained by means of an ordinary casualty caused by the negligence of another servant of the company. Under these circumstances, the loss must be deemed to be the result of a pure accident, like those to which all men in all employments, and at all times, are more or less exposed; and, like similar losses from accidental causes, it must rest where it first fell."—*Ibid.*

" With the plaintiff, the defendant contracted to pay hire for his services. Is it incident to this contract that the company should guarantee him against the negligence of his co-servants? It is admitted he takes upon himself the ordinary risks of his vocation; why not the extraordinary ones?"—*Murray* vs. *South Carolina Railroad Company*, 1 McMullan, 400.

And what is said by Chancellor Johnson in the concurring opinion is especially in point.

" He knew that the employment was perilous and that its success was dependent on the common efforts of all hands; and, with proper diligence and prudence, he might have been as well, and it does not follow that he might not have been better, informed than the defendants about the fitness and security of all the appointments connected with the train. If he was not, it was his own want of prudence, for which defendants are not responsible. If he was, he will be presumed to have undertaken to meet all the perils incident to the employment."—*Ibid*, 402.

The general doctrine is well stated in Pierce's American Railroad Law, p. 292; 1 Redfield, Law of Railways, p. 520, *et seq.*

And the rule applicable to employees themselves applies equally when the action is by the representatives of employees under the statute.—Pierce, 293.

In *Warner* vs. *Erie Railroad Company*, (39 N. Y., 468,) the jury found that the bridge fell from decay in its timbers. The Court said (page 475): "There is really, then, no conflict of evidence as to the care and skill used in the construction and maintenance of the bridge, the inspection to which it was subjected, the adequate skill and competency of the employees engaged in that specified duty, the experience of defendant, both in the construction and duration of such structures, and the absolute want of any actual notice to defendant or any of its employees of any defect, real or suspected, in the bridge;" and, on the general doctrine of law already referred to, the Court held that defendant was not responsible and "that it was the duty of the Court to take the case from the jury, and hold that, on the established facts, the plaintiff could not recover," and the rule laid down in *Warner* vs. *Erie Railroad Company* was recognized and approved in 49 N. Y., 528.

In *King* vs. *Boston Railroad Company*, (9 Cush., 113,) the accident was caused by the breaking of a switch. The Court held "there is no principle of law upon which this action can be maintained. The plaintiff can maintain his action only upon one of two grounds, to wit: that plaintiff was injured by neglect of co-employee or by neglect of the defendants themselves. That the plaintiff cannot recover on the first, is too clear for controversy; and it is clear that plaintiff cannot maintain his action on the last ground, and a nonsuit must be entered."

To same point are *McDermot* vs. *Pacific Railroad Company*, 30 Mo., 115; *Faulkner* vs. *Erie Railroad Company*, 49 Barb., 324; *Indianapolis Railroad Company* vs. *Love*, 10 Ind., 554; *Mad River Railroad Company* vs. *Barber*, 5 Ohio, 541.

And see a concise exposition of the law on the "liability of master to servants," by Judge Cooley, in the Southern Law Review for April, 1876.

Apply these legal principles to the case. There was not even the attempt by plaintiff to prove that the track and road-bed were unsound, defective or insufficient; or that the servants of the com-

pany employed in the construction, maintenance and supervision of it were incompetent, unskillful or negligent.

Not a single witness has given a particle of testimony on either of these points; and one or the other must be proved to entitle plaintiff to recover.

1. Whilst defendant proved that the track and road-bed had been carefully constructed, and was carefully supervised by competent and reliable servants, and that defendant had used the greatest care and diligence in securing a good and safe road-bed.

2. That all that the plaintiff relied upon as implied negligence was the alleged substitution of a bank and culvert for the trestle; and this is the foundation of the action in the complaint. Whereas all the evidence in the case for the plaintiff and defendant showed that the trestle had never been removed, but that the track still rested on the trestle, and that it was strong and sound.

3. That there was no proof by plaintiff that the filling in of the trestle was unwise or injudicious. Whereas defendant proved by the testimony of Thames, Caradeux and Tyler that such filling in was good engineering; and that instead of the road being weakened by it, it was stronger and safer. That it is a general law of railroad construction that trestles are constant sources of danger, and that a solid road-bed is always to be preferred.

4. That to assume, as the jury did, that the accident was caused by the filling in of the trestle, is to assume, without evidence, the very fact in dispute. For it cannot be said that it would not equally have happened had the trestle been open. And there is much evidence to show that by reason of the flood it would have happened in any event.

I have already cited plaintiff's witnesses to prove the flood. The testimony of defendant's witnesses is equally strong.

5. That had the trestle not been filled in and the accident occurred, plaintiff would have relied on the evidence of the case to prove the trestles were dangerous, and that defendant should have constructed solid banks and culverts.

6. That the trestle had been filled in about nine months; that Brickman, during all that period, was on the road, and that no complaint of the place being dangerous had been made by Brickman or any other engineer; but all of them ran over it in their daily duty, without a suspicion of danger or word of objection. Brickman knew that trestle had been filled—knew the locality—

knew the heavy fall of water that night—was further cautioned by Tharin, and yet went on without suggesting that there was danger at this point.

The language of Johnson, Ch., in Murray's case, is exactly in point: "With proper prudence and diligence he might have been as well, and it does not follow that he might not have been better, informed than the defendants about the fitness and security of all the appointments connected with the train. If he was not, it was his own want of prudence, for which defendants are not responsible. If he was, he will be presumed to have undertaken to meet all the perils incident to the employment."—402.

7. That without the slightest evidence to prove negligence, the jury could only have reached their conclusions by assuming:

1. That the filling of the trestle was an error of engineering, and weakened the road and caused the accident.

2. That such error or mistake of judgment on the part of the engineer was an act of gross negligence on the part of the company.

3. That the accident was due to the negligence, and to no other cause, and would not have happened but for that.

And yet not one of these propositions is true either in law or in fact.

8. That what influence the filling in of the trestle had in producing the disaster is opinion and speculation. While the fact is undoubted that there was that night a sudden and rapid accumulation of water, owing to an unprecedented rain. It is, therefore, clearly apparent that in the case made there is neither defect in the road or incompetency in the employees.

We might rest the case here, but a stronger ground remains. Even supposing there was a defect, the plaintiff, in order to recover, must prove that the defect was known to the defendant, and that the accident arose from the negligence of the defendant in not repairing the defect.

This is clearly put in Murray's case, in Pierce's Railroad Law, 294, already cited, and is referred to in all the leading cases cited, in which the principle of the rule is placed upon the fact that the employee has the best means of knowing defects in road and machinery, or carelessness and incompetency on the part of his fellow servants, and can give notice and leave the service if the defects are not remedied or the servants not removed.

In *Priestly* vs. *Fowler*, (3 M. & W., 1,) there was verdict for plaintiff. On motion in arrest of judgment, the Court said: "It has been objected to the declaration that it contains no premises from which the duty of the defendant, as therein alleged, can be inferred in law; or, in other words, that from the mere relation of master and servant no contract, and therefore no duty, can be implied on the part of the master to cause the servant to be safely and securely carried, or to make the master liable for damage to the servant arising from any vice or imperfection, *unknown to the master,* in the carriage or in the mode of loading or conducting it. *For, as the declaration contains no charge that the defendant knew any of the defects mentioned,* the Court is not called upon to decide how far such knowledge on his part of a defect unknown to the servant would make him liable;" and judgment was arrested.

The exact point is stated in *Wright* vs. *New York Central Railroad Company,* (25 N. Y., 562,): "Knowledge of the defect or insufficiency must be brought home to the master, or proof given that he was ignorant of the same through his own personal negligence or want of care. In other words, it must be shown that he either knew, or ought to have known, the defects which caused the injury."

And in *Warner* vs. *Erie Railroad Company,* (39 N. Y., 468,) the Court says: "The true principle applicable here is, I think, that when the defendant has erected a structure to be used in its ordinary and accustomed business without fault as to plan, mode of construction and character of materials, so that it was originally sufficient for all the purposes for which it was used; employs skillful and trustworthy agents to supervise, examine and test it, and that duty is performed with frequency, and with such tests as custom and experience have sanctioned and prescribed, it has exercised such care and skill as the law exacts of an employer in reference to his employee, and that *no liability can attach* to a party *for a defect in such structure,* by which an employee has sustained injury, *unless there has been actual notice or knowledge that defects existed,* which, unless promptly remedied, would be liable to produce serious or fatal consequences."

In *McMillan* vs. *Saratoga and Washington Railroad Company,* (20 Barb., 450,) the complaint alleged defect in the locomotive, and that defendants neglected to keep their road in good repair, and failed and refused to provide a good, safe and secure track, and

neglected to keep in repair the bridges and cattle guards and fences, and that by reason of such negligence the death of the engineer was caused.

There was demurrer to the complaint, and demurrer was sustained. On appeal, the Court said: "The plaintiff's intestate was the engineer. It was his duty to have made known the defects. He was responsible as well to the public as to the company for not making them known. He was more likely to know of occasional defects in fences, cattle guards or bridges than the company or their officers. He had the knowledge, or the means of knowledge, within his own power. He might have required indemnity against all risks, or he might have given notice to the company and thrown the risk upon them." The servant, then, to be entitled to recover, as seems to be established by all the cases, must prove actual notice to the principal of the defects complained of as causing the injury, or some of them. And in order to be able to prove notice, he must allege it in his complaint.—See, also, 2 Parson's Contracts, 42; Addison's Contracts, 744.

In *Seymour* vs. *Maddox*, (16 Adol. & Ellis, 326, 71 E. C. L.,) defendant possessed a theater. Plaintiff was hired as actor, and fell into a hole on stage. Declaration alleged that it was the duty of defendant to cause the floor to be lighted and the hole fenced, so as to prevent injury. Verdict for plaintiff. Held, on motion in arrest of judgment, that declaration was bad. Lord Campbell, C. J.: "The judgment must be arrested. The duty, a breach of which is laid, does not arise from the particular facts stated in the declaration, nor from the general relation of master and servant;" * *. and per Coleridge, J.: "No special contract is stated. If this duty arises from the general relation of master and servant, I do not well know where the master's liability is to stop. * * The servant is not bound to enter the particular service. If he does, he must take things as he finds them."

In *Couch* vs. *Steele*, (3 Ellis, 1 B., 407, 77 E. C. L.,) Lord Campbell, C. J.: "The count discloses no contract or legal duty of which there has been a breach, the subject of an action. * * * There being no allegation of a *scienter*. If we held the defendant liable on the count, we must hold a ship owner always liable to an action from every seaman, if from any accident, a butt having started, or the like, the ship was not seaworthy. No such action has ever been brought. This is a case of first impression, in support of which

neither a decision, nor even a dictum, has been brought to our notice, nor has any legal principle been urged in its support." And Coleridge, J.: "The state of the ship may have been such that the defendants and the master may, with perfect *bona fides*, have believed her to be seaworthy, though she was not. The plaintiff, therefore, must rely on a general principle, that in all such cases there is an implied contract that the vessel is seaworthy. It is enough to say that no such action has ever been maintained;" and the declaration was held bad, "there being no allegation of knowledge or deceit, nor of any express warranty."—*S. P. Hutchinson* vs. *Railroad Company*, 5 Exch., 343; *Wigmore* vs. *Jay*, 5 Exch., 357.

As there was no evidence whatever that the supposed defect in the road was known to the defendant, and such proof was necessary on the part of the plaintiff to entitle her to a verdict against defendant, the Court should have instructed the jury as prayed for in the fourth instruction: That in order to charge the defendant, it must be known that the track was defective, and that the defect was known to the President and Directors of the road; and this prayer is almost exactly in the words of that used in *Warner* vs. *Erie Railroad Company*, (39 N. Y., 469,) and which the Court said (p. 470) "would have actually precluded a recovery in this case."

These authorities also sustain the proposition that the complaint fails to state a legal cause of action and that the judgment should have been arrested.

This examination of the authorities establishes:

1. That the complaint does not state facts sufficient to constitute a cause of action.

2. That giving to the facts of the case all the weight that can be claimed for them, they fail to establish any cause of action against defendant; and, therefore, the defendant was entitled to have the judgment arrested or new trial granted, and it was error of law in the Circuit Judge not to grant such order.

In *Massey* vs. *Adams* (3 S. C., 263,) the Circuit Judge instructed the jury to find for the plaintiff. They found for the defendant. New trial was granted and defendant appealed, and the Court ordered that plaintiff have judgment absolute against defendant, saying: "The only question proper for our consideration is whether there was error of law in the order granting the new trial." That is exactly the question we raise here. Was there error of law in refusing the new trial and arrest of judgment?

In *McGowan* vs. *Lawrence* (3 S. C., 365,) "if it appears that some proposition of law material to the question has been erroneously solved, then there must be a new trial granted."

If "it is found, as in this case, that the judgment is contrary to the law, a new trial will be granted."—*Detheridge* vs. *Erle*, 3 S. C., 400.

We submit, also, that there was error of law in the Circuit Judge's refusal to grant a new trial on the ground of excessive damages.

The general principles governing new trials in such cases are stated in Graham & Waterman on New Trials, vol. 1, p. 413; vol. 3, pp. 1127–1133.

The Circuit Judge says, as strongly as he can well put it, that the damages are excessive. On that point he "entertains very decided convictions." He approves the New York law, fixing the maximum of damages in such cases at $5,000, and "would gladly follow it if it were the law here;" but, "in the absence of legislation, the law should be more definitely settled by adjudication in this State."

In other words, the Judge says the damages are excessive, the verdict should be set aside and the law definitely settled, but the power to do so is in the Supreme Court.

Here was clearly error of law, for it is expressly ruled in *Byrd* vs. *Small* (2 S. C., 388,) that the authority of the Circuit Judge to set aside verdict for excessive damages is without limit or restraint; and to same effect is *Craven* vs. *Rose*, (3 S. C., 77;) and, unless the Supreme Court can and does correct the error, this results: that a verdict, confessedly unjust, has been rendered and neither Court can redress it.

*Buttz*, with whom was *O'Connor*, contra:

Upon review of the evidence spread out in the printed record of this case, the following leading facts, necessary to be kept in view by the Court in considering the two motions, for a new trial and in arrest of judgment, are made to appear:

1st. That William M. Brickman, the husband and intestate of plaintiff, while in discharge of his duty as an engineer, at his post of duty on his engine, in the early morning of the 20th of September, 1873, with his train of freight cars, and one passenger coach

attached, came to his death while standing on his engine, which was precipitated suddenly, in the darkness of the night, through a broken culvert, to a depth of fifteen feet, through which the waters of the surrounding swamp were rushing.

2d. That this casualty, by which he met his death, was occasioned by the giving way of an earthen embankment, which had been thrown up over Polk Swamp, around and against an old and decayed trestle, which for over thirty years had spanned the swamp. The earth had been banked up and filled in up to the top and on a level with the track. This alteration in the crossing of the stream was made during the superintendency of Mr. Tyler, who directed the change of substitution of the embankment for the trestle, and, at the same time, in order to afford a vent for the waters during the rainy period, constructed, on the left bank of the swamp, and above the bed of the swamp, a brick culvert, whose arch was about twelve feet in height and twelve feet in width.

3d. The original trestle being open work, permitting a free and unobstructed passage of the collecting rains which had fallen, had stood for nearly forty years the pressure of storms and floods, without the occurrence of a single accident, and it is to be presumed that if no change had been made in the original structure it would have survived the pressure of this night and been standing to this day.

4th. It is evident, from the testimony, that after the heavy fall of rain which had taken place at this season the swamp became full, and the pressure of the body of water banked up against the earth around the old trestle, and without adequate vent, occasioned the break or sluice which resulted in washing away the superstructure of the road, with a great part of the old trestle, leaving a gully, into which the approaching engine fell.

5th. It appears from the evidence that, notwithstanding the fact that the rain this night extended over a large district of country traversed by the railroad, this was the only part of the road that gave way.

The propositions of fact involved in the case were all submitted to the jury:

1. Whether the accident was occasioned by the *vis major*, or was the result of negligence.

2. And whether there was any contributory negligence on the part of the plaintiff.

It being the province of the jury to pass upon the facts the moment they concluded to award in behalf of the respondent, it was tantamount to finding that the railroad company's negligence caused the death of Brickman; and, resting or acting upon this conclusion, the damages cannot be found excessive. The motion for a new trial was on the ground of excessive damages, and it would be capricious for the Judge to disturb any such verdict for damages in a case where death had ensued from negligence of the company.

The charge of the Judge to the jury was wholly in favor of the railroad company. The following propositions of law are relied upon as applicable to this case:

1. That it is a duty which a railroad company owes to its employees to furnish a proper and safe road-bed, culverts and crossings of dangerous places and trestles, and to see that every safeguard known to science and the construction and testing of these instrumentalities have been employed before exposing the lives and safety of those in their service, whom they are bound to preserve by their duty and obligation from all risk other than the ordinary risk of the employment.—*Vide* 2 Redfield, 231; *Hegerman* vs. *Western Railroad,* 3 Kernan, (13 N. Y.,) 1; Sherman on Negligence, 15, p. 13; *The Chicago and Northwestern Railroad, appellant,* vs. *Jackson,* 55 Ill., 492; the same against same, 45 Ill., 197; *Greenleaf* vs. *Illinois Central Railroad,* 29 Iowa, and in 4 American Reports, 182.

A brakeman on a railroad, in the discharge of his duty, while descending a defective ladder on a freight car, fell and was crushed by the engine so that amputation of his legs was necessary. It was held that the company was liable, unless the brakeman was negligent, or unless he knew or might have known of the defect in the ladder; and this latter was a question for the jury.—*Northwestern Railroad* vs. *Jackson,* 55 Ill., 492.

There was no privity of relation between the engineer of the train and the constructor of the culvert and builder of the embankment around the old trestle, or with the civil engineer, superintendent or contractor who planned the new work, which fell in. Brickman, the engineer, had no choice but to obey the orders of his superiors, and he was compelled this night to run his engine from Charleston to Augusta. He was not and could not be responsible for the defect in the embankment, or culvert, or road-bed,

as this work belonged to an entirely different department of the road, and they were not his co-servants. The fault was not that of a servant engaged on the same department; it was the act of a superior in another department.

Although a railroad may construct their road and furnish its machinery through its servants, yet other employees in different departments are not to be prejudiced by the negligence of such servants. This doctrine is explained and illustrated in the cases cited above. Those cases are singularly parallel to the one now under consideration. They run on all-fours with it.

The railroad company cannot plead that it was a case that comes under the head of contributory negligence. This plea can only avail where the fault or negligence complained of by a fellow-servant was that of a servant engaged in the same department of the common business. The defect in the road must have been such as the plaintiff might, by proper care, have taken notice of, and the damage resulting must have grown out of one of the risks assumed by him and incident to his employment. For instance, if the engine had been thrown from the track in consequence of an imposed obstruction, or from the negligence of the engineer or any of the servants on the train, and serious injury or death had ensued to one of the officers or hands on the train, this would have constituted that contributory negligence which would prevent a recovery. The engineer of the train and the constructor of the road worked in entirely independent spheres of action, and in no sense could Brickman have contributed to the negligence of the contractor or constructor, through which he met his death. The care of the road-bed was a department of the business of the road entirely separate and distinct from it. It was not in the power of Brickman to have cognizance of defects in the embankment or crossing, to guard against them.

It was certainly a question for the jury, and left to them to determine, whether the road at the point of the accident was in a safe condition, and whether the defendant was negligent in not furnishing a proper crossing for Brickman's engine at this point.— See Redfield on Railways, vol. 2, § 251, p. 571; *Dalton* vs. *Western Railroad Company*, 10 How. Prac. Rep., 97; 15 N. Y., 544.

In view of the magnitude of the interests which depend upon the skill of the agents operating railways, and the utter powerlessness of those who trust to that skill to provide for their own

security, railway companies are held to the strictest responsibility under this doctrine.—*Idem.*

It has been held that a traveler upon a railroad upon a free pass who should be injured by the negligence of the company is entitled to recover damages for his loss.—2 Redfield on Railways.

A party injured by a railroad, although in fault to some extent at the time, may, notwithstanding this, be entitled to reparation in damages for an injury arising from the negligence of another which he could not have avoided by the exercise of ordinary and reasonable care on the part of the injured party.—*Zemp* vs. *Northeastern Railroad Company,* 10 Rich., 90.

How could Brickman have avoided the injury? Suppose, even, that he could be chargeable with negligence; where the negligence of the railroad company is the proximate cause of the injury, but that of the plaintiff only remote, his action for reparation is maintainable.—*Idem.*

In the case of the *Union Pacific Railroad Company* vs. *Jesse L. Fant,* decided in the Supreme Court of the United States, October, 1873, it was held that the railroad company was responsible to one of its servants for an injury caused by the negligence of a fellow-servant, and the company was liable.—American Law Times, vol. 1, p. 121.

A master bricklayer was held responsible for injury caused by defective tools in the hands of an employee.—*Milk* vs. *Boone,* Am. Law Times.

The Supreme Court has no power to correct an error of fact committed by the Circuit Judge in refusing a motion for a new trial made on the ground that the evidence was insufficient to support the verdict.—*Abrahams & Son* vs. *Kelly & Barrett,* 2 S. C., 235.

The Supreme Court has no power to set aside the verdict of a jury upon questions of fact, even in a case tried in 1867 and taken by appeal to the late Court of Appeals.—*Edward* vs. *Scurry,* 1 S. C., 139.

The Supreme Court has no power, under the Constitution, to award new trials for errors of fact in the verdicts of juries. Its authority in granting new trials is limited to cases where there are errors of law in the decisions or rulings of the Judge.—*Floyd* vs. *Abney,* 1 S. C., 114.

The Supreme Court cannot grant a new trial for excessive damages.—*Craven* vs. *Rose,* 3 S. C., 72; *Massey* vs. *Adams,* 3 S. C., 254.

A motion for a new trial can only be granted upon exceptions, or for insufficient evidence, or for excessive damages on Circuit.—See Code of Procedure, p. 485.

The Judge on Circuit having refused the motion for a new trial, made on the only grounds legally admissible, the appellant is thereby estopped from going further or higher.—See Graham & Waterman on New Trials, vol. 3., Chap. XV., p. 1203.

The motion in arrest of judgment goes to the form of the plead-ings and not to the substance. By Section 165 of the Code all that the complaint shall contain is: 1st. The title of the cause, Court, County in which trial to be had, and names of parties. 2d. A plain and concise statement of the facts constituting a cause of action without unnecessary repetition. 3d. A demand of the relief to which the plaintiff supposes himself entitled. If the recovery of money be demanded, the amount thereof shall be stated.

July 12, 1876.   The opinion of the Court was delivered by

WILLARD, A. J.   The charge appears to have presented the law of the case favorably for the defendants on all the points raised by their requests to charge.   It does not appear that defendants' coun-sel excepted to the charge as variant from the requests submitted by them.   This would ordinarily lead to the conclusion that they were satisfied that the charge was in conformity to their requests. This inference is strengthened by comparing the charge with the requests.   The first request was substantially charged.   The propo-sitions included in the second to the fifth requests, inclusive, although modified, were charged as favorably for the defendants as the law would permit.   The charge places the legal question of the liability of the defendants upon the solution of the question whether there were patent defects in the works or machinery of the defendants, and whether such defects implied gross negligence.   It would be difficult to state the law more favorably for the defendants.   If such defects existed, the defendants would be chargeable with notice of their existence from the nature of the defects themselves.   As to the sixth request, that the employee takes the risk of his employ-ment, the charge seems to have omitted nothing favorable for the defendants.   Their liability is placed upon the ground of gross neg-ligence alone.   As neither party alleges any error in this limitation of the liability of the defendants to a case of gross negligence, it is

not necessary for us to look into the state of the law on that subject. All we are called upon to say is, that the defendants were not entitled to a more favorable charge. No error is shown to exist in the rulings or charge of the Judge. The grounds for the motion for a new trial involved matters of fact only. They are reducible to two propositions: first, that the verdict was against evidence, and, second, that the damages were excessive. To pass upon these questions, it is necessary that the Court should have power to weigh the evidence and draw from it conclusions of fact. This could be done by the Court of original jurisdiction, but cannot be done by us in a case in the nature of an action at law, as we have just held in *Gibbs* vs. *Elliott.*

But it is said that it appears from the opinion of the Circuit Court upon the motion for a new trial that the Judge was only prevented by a misconstruction of the law from granting a new trial, both on the ground of the verdict being against evidence and being excessive. It is true that he shows that the determination of his mind would be in favor of granting a new trial but for the effect of certain authorities referred to by him. It does not follow from this that the scruple in his mind was as to his legal powers in the case. There was a certain amount of discretion to be exercised by him in coming to his conclusion, the solution of which depended upon his judgment whether substantial justice had been done in the case. This discretion is a sound discretion, and seeks the light of adjudicated cases and precedents. We are compelled to conclude that it was in the last named aspect alone that the Judge allowed his mind to be affected by the authorities. It certainly cannot be affirmed, from the evidence afforded by his opinion, that the Circuit Judge declined to look into the merits of the motion on the facts involved upon any idea that he had no power of granting new trials upon the grounds there presented to him in a case where he believed that substantial justice had not been done by the verdict of the jury. If he felt at full liberty to exercise that sound discretion, but has failed to give full weight to all the considerations that ought to have had force in moulding that exercise of discretion, it is an error that cannot be reached by our jurisdiction, not being an error of law.

If the Circuit Judge had a clear judgment that the evidence did not support the verdict, he should unhesitatingly have set the verdict aside. If, on the other hand, it was a case of nicely-balanced evidence, adduced to support contradictory conclusions where the

evidence on either side would have been sufficient to support the proposition sought to be deduced from it, in the absence of the other, then the Court could properly defer to the jury as the constitutional tribunal for the determination of questions of fact. So, where there is a question of the character and credibility of witnesses, the Court ought to give great weight to the conclusions of the jury, if apparently impartial. So, if there is a known or apparent prejudice in the minds of the jury arising from sympathy for the one side and antipathy or indifference for the other, as is sometimes the case where corporations are concerned, the Court should not permit a verdict to stand that contradicts its sense of right, if in its judgment the testimony is defective in strength to support such verdict. We cannot assume in the present case that the Court has failed to receive due influence from these considerations, for the opinion does not exclude the idea that the action of the Court resulted from a doubt as to the correctness of the conclusions of the jury, while to set aside a verdict in such cases the judgment of the Court on the facts should be clear.

The appeal from the order denying the motion in arrest presents no ground for disturbing the judgment below. The motion in arrest is based upon the want of certain averments in the complaint.

The true office of the pleadings, under the Code, is to shape the introduction of evidence at the trial. The Court is at all times bound to allow amendments to the pleadings, in furtherance of justice and upon reasonable and just terms, and, even after judgment, may amend the pleadings so as to conform to the facts proved.—Code, § 195. The power of amendment after judgment is of the utmost importance to certain cases, in order to give symmetry to the system of pleading adopted by the Code. The rigidity of the rules of pleading at common law arose largely from the fact that the record, consisting of the pleadings, *postea* and judgment, were intended to form a record that should disclose the true matters at issue, as operating both directly on the rights of parties and privies, and indirectly by way of estoppel. Hence arose a tendency to confine the issues and judgment to the scope of the pleadings. This theoretical advantage was more than compensated by the evils resulting from inability to mould the process of the Court to meet the necessities arising in the course of the development of the issues involved. This led, in practice, to a liberality in the

admission of evidence and a complexity in the structure of pleading that almost destroyed the value of the record. The Code solves this difficulty by enforcing the largest duty of allowing amendments and admitting testimony, and yet permitting parties, when they deem it important that the record should show the true nature of the issues on which the judgment rests, to have the pleadings moulded upon these issues, after verdict, and either before or after judgment. This is of special importance where the title to land is affected by the judgment. It would follow that the grounds alleged by way of arrest are insufficient. The most that could have been demanded by either party was that the pleadings should be conformed to the facts found. Neither party appears to have made such a request, nor is any reason disclosed why either party should deem such an application of any importance.

The motion should be denied.

*Wright*, A. J., concurred.

*Moses*, C. J., concurred and filed the following separate opinion :

MOSES, C. J. No exception having been taken to the charge, the motion for a new trial was one exclusively for the presiding Judge, to be determined by his view of the duty of the jury in regard to the facts and the application of the law as expounded by him. The propriety of the verdict, both as to the party in whose favor it was rendered and the amount, were elements necessarily entering into his consideration of the motion.

The very earnest and ingenious argument of the learned counsel for the appellant, while it fails to impress us with his conviction that the refusal of the presiding Judge resulted from a belief of his want of authority to grant a new trial on the grounds that the verdict was against the evidence, and excessive in amount, has induced me to examine with much care if the position is well founded. So far from finding anything to justify it, the whole current of his opinion conclusively shows that, recognizing his authority, he refuses to disturb the verdict because, as he says, although not able to "discover the evidence upon which the jury found gross negligence, if negligence of any degree; but there was testimony sufficient to go to the jury, and upon it they have found the verdict before us, and I am not prepared to say it is without evidence to support it." In fact, he premises his opinion with the following

language : "I have been strongly inclined to grant a new trial in this case, as the verdict of the jury is very far from commending itself to my approval. But, after hearing the argument, my opinion has been modified, not as to the merits, but as to the propriety of my applying the remedy asked for."

Where there is no averment of error of law in the charge of the Circuit Judge, or in the refusal on request to charge, this Court has no power to order a new trial. In addition to what has been said in the opinion of my associate in regard to the motion in arrest of judgment, as affected by the provisions of the Code, I will only add that the case of *Corbin* vs. *City Council of Charleston* (15 Rich., 209,) decides the very point, by holding that objections which might have been fatal to the plaintiff, if made upon demurrer, are cured by the verdict.

---

HEARD APRIL TERM, 1876.